**McMANIMON, SCOTLAND & BAUMANN, LLC**
75 Livingston Avenue, Suite 201
Roseland, NJ 07068
(973) 622-1800
Anthony Sodono, III (asodono@msbnj.com)
Sari B. Placona (splacona@msbnj.com)
*Counsel to William Focazio, MD, P.A. and*
*Endo Surgical Center of North Jersey, P.C.,*
*Chapter 11 Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Case No. 18-10752 (VFP) |
| | Jointly Administered |
| WILLIAM FOCAZIO, MD, P.A. and | |
| ENDO SURGICAL CENTER OF NORTH | Chapter 11 |
| JERSEY, P.C. | |
| | Honorable Vincent F. Papalia, U.S.B.J. |
| Debtors. | |

**SECOND AMENDED DISCLOSURE STATEMENT PURSUANT TO**
**SECTION 1125 OF THE BANKRUPTCY CODE DESCRIBING CHAPTER 11**
**PLAN OF REORGANIZATION PROPOSED BY THE DEBTORS-IN-POSSESSION**

PLEASE READ THIS DISCLOSURE STATEMENT ("**DISCLOSURE STATEMENT**") CAREFULLY. THIS SECOND AMENDED DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN OF REORGANIZATION. THE DEBTORS BELIEVE THAT THIS PLAN IS IN THE BEST INTEREST OF THE CREDITORS AND THAT THE PLAN IS FAIR AND EQUITABLE. THE DEBTORS URGE THAT THE VOTER ACCEPT THE PLAN. IF YOU VOTED ON THE DEBTORS PRIOR PLAN YOU NEED NOT TO SUBMIT ANOTHER VOTE AS THE PLAN OF REORGANIZATION DESCRIBED HEREIN TREATS CREDITORS THE SAME AS THE PRIOR PLAN.

**McMANIMON, SCOTLAND,**
 **& BAUMANN, LLC**
*Counsel to William Focazio, MD, P.A. and*
*Endo Surgical Center of North Jersey, P.C.,*
*Chapter 11 Debtors and Debtors-in-Possession*

By:     /s/ Anthony Sodono, III
        ANTHONY SODONO, III
        SARI B. PLACONA

**WILLIAM FOCAZIO, MD, P.A. and ENDO**
**SURGICAL CENTER OF NORTH JERSEY,**
**P.C.**



By:     */s/* William J. Focazio
        WILLIAM J. FOCAZIO

November 13, 2020

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ................................................................................................ 3

   A. Purpose of This Document ........................................................................... 3

   B. Confirmation Procedures ............................................................................. 4

      1. Time and Place of the Confirmation Hearing........................................... 5

      2. Deadline For Voting For or Against the Plan........................................... 5

      3. Deadline For Objecting to the Confirmation of the Plan ........................ 6

      4. Identity of Person to Contact for More Information Regarding the Plan ............ 6

   C. Disclaimer ................................................................................................... 6

II. BACKGROUND ............................................................................................... 7

   A. Background of Debtor.................................................................................. 7

   B. Circumstances Leading To Bankruptcy ...................................................... 9

   C. First Commerce Bank ................................................................................ 10

III. THE DEBTOR'S BANKRUPTCY.................................................................. 11

   A. The Debtor's Chapter 11 Filing................................................................. 11

      1. Motion for Joint Administration............................................................ 11

      2. Motion for an Order Authorizing the Interim and Final Use of Cash Collateral  11

      3. Debtor's Motion for an Interim Order and a Final Order (i) Prohibiting Utility Companies From Discontinuing, Altering, or Refusing Service; (ii) Deeming Utility Companies to Have Adequate Assurance of Payment; and (iii) Establishing Procedures for Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§ 105(a) and 366....................................................................................... 12

      4. The Debtor's Motion for Authority to Continue to Use Existing Bank Accounts and Business Forms Pursuant to 11 U.S.C. §§ 105(a) and 363(c) ......................... 12

      5. Debtor's Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 507(a)(4) and 507(a)(5): (i) Authorizing the Debtor to Pay Certain Pre-Petition Wages, Salaries, Withholding and Payroll-Related Taxes for Pre-Petition Periods; (ii) Directing All Banks to Honor Pre-Petition Checks for Payment of Pre-Petition Employee Obligations; and (iii) Authorizing the Debtor to Honor Workers' Compensation and Certain Employee Benefit Obligations................................................................. 12

      6. Motion for an Order Directing Credit Card Processors to Honor their Contracts with the Debtor Pending Assumption or Rejection Under 11 U.S.C. §§ 365 and 105(a) .................................................................................................... 13

   B. Significant Events During the Bankruptcy ............................................... 13

      1. Bankruptcy Proceedings ....................................................................... 13

      2. Procedures Implemented to Resolve Financial Problems ..................... 19

      3. Current and Historical Conditions........................................................ 19

IV. SUMMARY OF THE PLAN OF LIQUIDATION ......................................... 20

   A. What Creditors Will Receive Under the Proposed Plan ........................... 20

   B. Unclassified Claims ................................................................................... 20

      1. Administrative Expenses and Fees ....................................................... 21

      2. Fee Claims............................................................................................. 21

      3. Priority Tax Claims ............................................................................... 24

C. Classified Claims and Interests ................................................................. 34
   1. Classes of Secured Claims ................................................................. 34
   2. Classes of Priority Unsecured Claims ............................................... 34
   3. Class of General Unsecured Claims ................................................... 35
   4. Class of Interests ............................................................................... 35
D. Means of Effectuating the Plan .............................................................. 35
   1. Funding for the Plan .......................................................................... 35
E. Other Provisions of the Plan ................................................................... 36
   1. Executory Contracts and Unexpired Leases ...................................... 36
   2. Changes in Rates Subject to Regulatory Commission Approval ....... 37
   3. Retention of Jurisdiction ................................................................... 37
   4. Procedures for Resolving Contested Claims ...................................... 39
   5. Effective Date .................................................................................... 39
   6. Modification ...................................................................................... 39
F. Tax Consequences of Plan ....................................................................... 40
G. Risk Factors ............................................................................................. 40
V. CONFIRMATION REQUIREMENTS AND PROCEDURES ........................... 41
A. Who May Vote or Object to the Debtor's Plan of Reorganization ........... 41
   1. Who May Object to Confirmation of the Plan ................................... 41
   2. Who May Vote to Accept/Reject the Plan ......................................... 41
   3. Who Is Not Entitled to Vote .............................................................. 42
   4. Who Can Vote in More Than One Class ............................................ 43
   5. Votes Necessary to Confirm the Plan ................................................ 43
   6. Votes Necessary for a Class to Accept the Plan ................................ 43
   7. Treatment of Nonaccepting Classes .................................................. 43
   8. Request for Confirmation Despite Nonacceptance by Impaired Class(es) ......... 44
H. Liquidation Analysis ................................................................................ 44
I. Feasibility ................................................................................................. 47
VI. EFFECT OF CONFIRMATION OF PLAN ....................................................... 49
A. Discharge .................................................................................................. 49
B. Release of Claims ..................................................................................... 50
   1. Release ............................................................................................... 50
   2. Settlement of Claims and Controversies; General Injunction ............ 51
C. Revesting of Property in the Debtors ....................................................... 52
D. Modification of Plan ................................................................................ 52
E. Post-Confirmation Conversion/Dismissal ................................................ 52
F. Closing of Case ........................................................................................ 54

4848-8167-6242, v. 1

# I.

## INTRODUCTION

William Focazio, MD, P.A. ("<u>Focazio MD PA</u>"), and Endo Surgical Center of North Jersey, P.C. ("<u>Endo Surgical</u>") (collectively, the "<u>Debtors</u>") are the Debtors and Debtors-in-Possession in the instant chapter 11 bankruptcy case.  On January 13, 2018, the Debtors each commenced their own bankruptcy case by filing a voluntary chapter 11 petition under the United States Bankruptcy Code (the "<u>Code</u>"), 11 U.S.C. § 101, <u>et seq.</u>  Chapter 11 of the Code allows the Debtor to propose a plan of reorganization.

The plan may provide for the Debtors to reorganize by continuing to operate, to liquidate, or a combination of both.  THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT ("<u>DISCLOSURE STATEMENT</u>") FOR THE PLAN OF REORGANIZATION (the "<u>Plan</u>") WHICH IS ANNEXED AS **<u>EXHIBIT A</u>**.  ***This is a reorganization plan.***

### A.    Purpose of This Document

This Disclosure Statement summarizes what is in the Plan and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.

**<u>READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:</u>**

(1)    **WHO CAN VOTE OR OBJECT,**

(2)    **THE PROPOSED TREATMENT OF YOUR CLAIM (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE IN A CHAPTER 7 LIQUIDATION,**

(3)    **THE HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,**

(4)    **WHAT THE COURT WILL CONSIDER WHEN DECIDING WHETHER TO CONFIRM THE PLAN,**

(5)    **THE EFFECT OF CONFIRMATION, AND**

(6)    **THE FEASIBILITY OF THE PLAN.**

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement.  If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.  Bankruptcy Code Section 1125 requires a Disclosure Statement to contain "adequate information" concerning the Plan. The term "adequate information" is defined in Code Section 1125(a) as "information of a kind, and in sufficient detail," about the Debtors and their operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of the Debtors to make an informed judgment about accepting or rejecting the Plan. The Bankruptcy Court ("Court") has determined that the information contained in this Disclosure Statement is adequate, and it has approved this document in accordance with Bankruptcy Code Section 1125.

This Disclosure Statement is provided to each creditor whose claim has been scheduled by the Debtors or who have filed a proof of claim against the Debtors as of the date of approval of this Disclosure Statement. Under the Bankruptcy Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to or concurrently with such solicitation.

**B.    Confirmation Procedures**

Persons Potentially Eligible to Vote on the Plan

In determining acceptance of the Plan, votes will only be counted if submitted by a creditor whose claim is duly scheduled by the Debtors as undisputed, non-contingent and unliquidated, or

who, prior to the hearing on confirmation of the Plan, has filed with the Court a proof of claim which has not been disallowed or suspended prior to computation of the votes on the Plan. The Ballot Form that you received does not constitute a proof of claim. If you are uncertain whether your claim has been correctly scheduled, you should check the Debtors' Schedules, which are on file at the office of the Clerk of the Bankruptcy Court located at: United States Bankruptcy Court, Martin Luther King Federal Building & Courthouse, 50 Walnut Street, Third Floor, Newark, New Jersey 07102. The Clerk of the Bankruptcy Court will not provide this information by telephone.

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. IF THE COURT, HOWEVER, LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTORS AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE. ***IF YOU VOTED ON THE PRIOR PLAN YOU NEED NOT SUBMIT ANOTHER VOTE AS THE TREATMENT IN THIS PLAN IS THE SAME AS THE PRIOR PLAN.***

### 1. Time and Place of the Confirmation Hearing

The hearing at which the Court will determine whether to confirm the Plan will take place on **November 24, 2020, at 2:00 p.m.**, in Courtroom 3B, United States Bankruptcy Court, Martin Luther King Jr. Federal Building & Courthouse, 50 Walnut Street, Third Floor, Newark, New Jersey 07102. Due to COVID-19, the hearing will be held telephonically.

### 2. Deadline For Voting For or Against the Plan

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to Anthony Sodono, III, Esq. and Sari B. Placona, Esq. at McManimon, Scotland, & Baumann, LLC, 75 Livingston Avenue, Suite 201, Roseland, New Jersey

4848-8167-6242, v. 1

07068, on or before **November 20, 2020**. ***If you voted on the prior plan you need not revote and your prior vote will be accepted and counted.   Nothing in this plan changes the treatment of any claims set forth in the prior plan.***

Your ballot must be received by **November  20, 2020,** or it will not be counted.

### 3.    Deadline For Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must be filed with the Court and served upon Anthony Sodono, III, Esq. (asodono@msbnj.com) and Sari B. Placona, Esq. (splacona@msbnj.com) at McManimon, Scotland, & Baumann, LLC, 75 Livingston Avenue, Suite 201, Roseland, New Jersey 07068 by **November  20, 2020**.

### 4.    Identity of Person to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact the Debtors' counsel, Anthony Sodono, III, Esq. and Sari B. Placona, Esq. at McManimon, Scotland, & Baumann, LLC, 75 Livingston Avenue, Suite 201, Roseland, New Jersey 07068, telephone (973) 622-1800 or by emailing at the email addresses set forth in paragraph 3 above.

### C.    Disclaimer

The financial data relied upon in formulating the Plan is based on the Debtors' books and records as well as the opinion of Dr. William J. Focazio regarding future business prospects.  The information contained in this Disclosure Statement is provided by the Debtors and their professionals.  The Debtors represent that everything stated in the Disclosure Statement is true to the Debtors' best knowledge, information, and belief.

**PLEASE NOTE THAT THE APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A RULING ON THE MERITS, FEASIBILITY OR DESIRABILITY OF THE PLAN.**

## II.

## BACKGROUND

### A.    Background of Debtor

Focazio MD PA is a professional association gastroenterology medical practice organized in the State of New Jersey.  The practice is located at 999 Clifton Avenue, Clifton, New Jersey (the "Property").  The Property was previously owned by DVCO, LLC ("DVCO").  DVCO is owned by William J. Focazio, M.D. ("Dr. Focazio").  Pursuant to an agreement with First Commerce Bank ("FCB") (Doc. 391), the Property was conveyed to FCB.  Focazio MD PA remains at the Property as a tenant pursuant to the FCB settlement agreement on a month to month lease.

Endo Surgical is a surgical center located at the Property that performs elective surgeries. Endo Surgical is owned by Dr. Focazio.  Endo Surgical remains at the Property pursuant to the FCB settlement.  As set forth more fully in the settlement agreement, there is a two-year lease/purchase option for the Property.  Endo Surgical operates on the second floor of the Property. Dr. Focazio operates his medical practice out of the first floor.

Debtors' revenues are generated by three sources: (1) surgeries and other medical procedures performed by Dr. Focazio, (2) facility/surgical room fees, and (3) surgeries performed by other third-party physicians operating at the facility.

Focazio MD PA currently employs approximately four (4) full-time employees.  Endo Surgical currently employs approximately three (3)) employees.

On or about January 23, 2015, DVCO entered into a certain commercial lease with the Debtors for a portion of the Property.  On December 5, 2016, the Honorable Thomas J. Laconte, P.J., Ch., entered an order appointing Lawrence J. Thomson as receiver (the "Receiver"), of the

4848-8167-6242, v. 1

Property (the "Order").  The Order empowered the Receiver with care and possession of the Property.  As a result of the Receiver's Order and ultimately facing an eviction at the hands of the Receiver and to protect its businesses, the Debtors filed for protection under Chapter 11, Title 11 of the United States Code ("Bankruptcy Code") to reorganize their affairs.

Prior to and since the filing date, the Debtors have had difficulty collecting their medical receivables due, in part, to inexperienced and careless staff leading to faulty infrastructure and certain issues with insurance companies.  For example, Debtors' insurance claims were "flagged" by certain insurers as not having all the required data to process the claims.  Such data was ministerial in nature, however, Debtors' staff failed to provide the correct information resulting in denial of the claims.  The Debtors are now much better positioned to collect aged receivables and more importantly, on a go forward basis, due to hiring more experienced and more diligent personnel.  Also, the Management Company (described more fully herein) will assist the Debtors by infusing funds into operations when needed and managing the facility to ensure a more effective and fluid collection process.  Further, the Debtors were shut down from May through September 2019, due in part, to ministerial error by prior staff to reapply for accreditation with the Department of Health which was ultimately rectified.  The Debtors are now poised to increase their businesses upon exiting bankruptcy.

Due to COVID-19, the Debtors' operations ceased as a result of the State of New Jersey shuttering all elective surgeries.  During the shutdown, Dr. Focazio registered to volunteer his services to confront the pandemic.  Dr. Focazio was not called into service by the State of New Jersey to assist in the pandemic, however, he was on standby and ready, willing and able to help in any manner required.  Moreover, Dr. Focazio inventoried his medical equipment including ventilators to prepare to help patients at his surgery center.  Further, he prepared his surgical units

to assist any Covid-19 patients requiring life-saving care.  Thus, due to the pandemic, Dr. Focazio could not generate any funds.  Now, however, Dr. Focazio is generating revenues by conducting extensive COVID testing and is again examining patients.  The Debtors anticipates a rash of new business since many patients have not been willing to visit their doctors during the pandemic. Suffice to say, operations are resuming in the ordinary course of business.

Dr. Focazio has successfully obtained a pool of potential new clients.  He is also hiring other physicians to perform surgeries to increase profits. For example, one doctor will perform bariatric surgery as well as general surgery.  Another will perform endoscopy procedures and hiatal hernia repairs.  A third doctor will perform joint and orthopedic treatments.  A fourth doctor will perform pain treatment.  The Doctor is also exploring other disciplines to increase revenues. Further, since the Management Company will be overseeing operations which allows Dr. Focazio to concentrate of solely practicing medicineand avoid administrative duties.  The Management Company is also bringing in other doctors.

**B.        Circumstances Leading To Bankruptcy**

On or about January 23, 2015, DVCO entered into a certain commercial lease with the Debtors for a portion of the Property.  On December 5, 2016, the Honorable Thomas J. Laconte, P.J., Ch. (the "Receiver"), entered an order appointing Lawrence J. Thomson as receiver of the Property (the "Order").

The Order empowered the Receiver with care and possession of the Property.  Pursuant to the Order, the Debtor was directed to pay to the Receiver all rents.  The Receiver was authorized to prosecute all legal proceedings necessary to protect the Property.  The Receiver stated that no payments were made by the Debtors during the term of the receivership.

On November 17, 2017, the Receiver demanded payment for all outstanding rent.  On

9

November 29, 2017, the Receiver filed a Verified Complaint against the Debtor and DVCO in the Superior Court of New Jersey, Law Division, Special Civil Part, Landlord Tenant Division, Passaic County (the "Passaic County Matter").  An eviction proceeding in the Passaic County Matter was scheduled for January 16, 2018 which resulted in the Debtors filing for bankruptcy protection.

The Debtors were harmed by poor back office infrastructure and it is believed there are multi-millions of uncollectible accounts receivables.  In addition, HMO's have forced physicians to accept less for services and medical reimbursement payments are processed more slowly and at a reduced rate.   The Debtors are hopeful with their new contemplated doctors and unique disciplines, they will generate higher profit surgeries/services and increase the facility fees.

### C.   First Commerce Bank

On February 27, 2020, Focazio MD PA, along with Endo Surgical and Dr. Focazio individually, filed a Motion (I) Approving Settlement and Compromise Pursuant to 11 U.S.C. § 105(A) and Fed. R. Bankr. P. 9019; (II) Permitting Debtor to Enter Into Modified Leases; (III) Resolving First Commerce Bank's Claims; and (IV) Granting Related Relief (the "Settlement Motion").   The Settlement Motion approved a forbearance agreement and deed-in-lieu of foreclosure agreement.  Approval of the settlement was a major part of the Debtors moving forward with their plan of reorganization.  Significantly, the settlement calls for a release of over $7 million in secured claims as long as the settlement is adhered to.

FCB, the Debtors, and the various non-debtor and debtor persons and entities indebted to FCB on account of the loans and other obligations, the parties, including the Debtors, have agreed upon terms which are set forth in the Agreement.  Such terms release substantial claims against several parties.

Specifically, in connection with the Agreement (including the releases of FCB and FCB

related persons and entities set forth therein), the following was approved: (a) Leases between FCB and the Debtor will be modified to: (i) fix the rents payable to FCB; (ii) provide for the termination of the Leases upon the maturity of the Agreement; (c) authorize the Tenant(s) to commence the modified Lease payments directly to FCB; (d) approve agreements between FCB and the Debtor concerning the allowance and treatment of FCB's claims; (e) FCB agrees to vote in favor of the Debtor's and affiliates plans of reorganization.  Most significantly, the settlement authorized the Debtor to remain at the Property under a two-year lease with an option to acquire the Property. The right to acquire the property is also a significant inducement to the Management Company since it may want to partner with Dr. Focazio and/or Debtors to acquire an interest in the property at 999 Clifton Ave., Clifton, New Jersey.  This allows the Debtors to maintain their on-going business in the same space without any moving and renovation costs.

### III.

### THE DEBTOR'S BANKRUPTCY

**A.       The Debtor's Chapter 11 Filing.**

The Debtors each filed their own voluntary Chapter 11 petition on January 13, 2018 (the "Petition Date").  Concurrently with the filing of its chapter 11 petition, the Debtors filed certain motions and proposed Orders (collectively, the "First-Day Orders"):

**1.       Motion for Joint Administration**

The Debtors sought entry of an order jointly administering their case.  On January 19, 2018, the Court entered an Order granting joint administration of the Debtors' cases.  Docket No. 24.

**2.       Motion for an Order Authorizing the Interim and Final Use of Cash Collateral**

The Debtors sought entry of an order authorizing the interim and final use of Cash Collateral.  The use of Cash Collateral was necessary to ensure that the Debtors continue to monitor

4848-8167-6242, v. 1

patients so as to not lose its valuable customers during the reorganization.  On January 23, 2018, the Court entered an Order for Segregation of Cash Collateral and Other Relief.  Docket No. 34. On May 3, 2018, the Court entered and Order Allowing Use of Cash Collateral and For Other Relief.  Docket No. 120.

      **3.**      **Debtor's Motion for an Interim Order and a Final Order (i) Prohibiting Utility Companies From Discontinuing, Altering, or Refusing Service; (ii) Deeming Utility Companies to Have Adequate Assurance of Payment; and (iii) Establishing Procedures for Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§ 105(a) and 366**

The Debtor sought an (i) an Interim Order, and (ii) a Final Order, pursuant to sections 105(a) and 366 of the Bankruptcy Code, (a) prohibiting the utility companies from discontinuing, altering or refusing service to the Debtors, except as set forth herein, (b) deeming the utility companies adequately assured of future performance on the basis of payment of a two-week security deposit, and (c) establishing procedures for resolving requests for additional assurance of payment.  On January 19, 2018, the Court entered an Interim Order Prohibiting Utility Companeis from Altering, Refusing or Discontinuing Service to the Debtors.  Docket No. 27.

      **4.**      **The Debtor's Motion for Authority to Continue to Use Existing Bank Accounts and Business Forms Pursuant to 11 U.S.C. §§ 105(a) and 363(c)**

The Debtors sought authority to maintain and use their existing bank acount.  On January 22, 2018, the Court entered an order Authorizing Maintenane and Use of Existing Bank Accounts and Existing Business Forms.  Docket No. 33.

      **5.**      **Debtor's Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 507(a)(4) and 507(a)(5): (i) Authorizing the Debtor to Pay Certain Pre-Petition Wages, Salaries, Withholding and Payroll-Related Taxes for Pre-Petition Periods; (ii) Directing All Banks to Honor Pre-Petition Checks for Payment of Pre-Petition Employee Obligations; and (iii) Authorizing the Debtor to Honor Workers' Compensation and Certain Employee Benefit Obligations**

4848-8167-6242, v. 1

The Debtors sought authorization to (i) pay employee claims for wages, salaries, commissions, contractual compensation, sick pay, personal pay, holiday pay, other accrued compensation, withholding and payroll related taxes for the Current Pay Period (as defined therein); (ii) direct all banks to honor pre-petition checks for payment of employee obligations in the Current Pay Period; and (iii) honor workers' compensation and certain employee benefit obligations. On January 19, 2018, the Court entered an Order Authorizing Pre-Peitton Wages. Docket No. 26.

### 6. Motion for an Order Directing Credit Card Processors to Honor their Contracts with the Debtor Pending Assumption or Rejection Under 11 U.S.C. §§ 365 and 105(a)

The Debtors sought authority of the continuation of acceptance of credit cards and custom practices. On January 19, 2018, the Court entered and Order Authorizing Continuation of Custome Practices. Docket No. 25.

### B. Significant Events During the Bankruptcy

### 1. Bankruptcy Proceedings

The following is a chronological list of significant events which have occurred during this case:

On January 14, 2018, the Debtors filed an application to approve the retention of Trenk, DiPasquale, Della Fera & Sodono, P.C. ("Trenk DiPasquale") as counsel. Docket No. 12. Trenk DiPasquale's retention was approved on February 9, 2018. Docket No. 51.

On January 16, 2018, the Debtors filed an application to approve the retention of Bederson, LLP ("Bederson") as their accountants. Docket No. 13. Bederson's retention was approved on February 9, 2018. Docket No. 52.

The Debtors' Initial Debtor Interview and meeting of creditors was conducted on February 21, 2018. No creditors appeared and therefore no Creditors' Committee was formed.

On October 17, 2018, the Debtor filed an application to approve the retention of McManimon, Scotland & Baumann ("MSB") as counsel. Docket No. 183. By order entered October 29, 2018, MSB was retained as Debtors' counsel. Docket No. 191.

On January 19, 2018, an Order was entered granting joint administration of the Debtors' cases. Docket No. 24

The Debtors sought an order authorizing the interim and final use of Cash Collateral. The use of Cash Collateral was necessary to ensure that the Debtors continued to operate its business during the reorganization. On January 23, 2018, an Order was entered for Segregation of Cash Collateral and Other Relief. Docket No. 34. The Debtors sought an (i) an Interim Order, and (ii) a Final Order, pursuant to sections 105(a) and 366 of the Bankruptcy Code, (a) prohibiting the utility companies from discontinuing, altering or refusing service to the Debtor, except as set forth herein, (b) deeming the utility companies adequately assured of future performance on the basis of payment of a two-week security deposit, and (c) establishing procedures for resolving requests for additional assurance of payment. On January 19, 2018, an Interim Order was Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service to the Debtors. Docket No. 27.

On January 22, 2018, an order was entered Authorizing Maintenance and Use of Existing Bank Accounts and Existing Business Forms. Docket No. 33.

On January 19, 2018, an order was entered Authorizing Continuation of Custom Practices. Docket No. 25.

On April 6, 2018, the Debtors filed a Motion to Approve Compromise with FCB. See Case No. 18-10752; Docket No. 95. The compromise entailed, among other things, the Debtors and

FCB entering into a Forbearance Agreement.  On May 3, 2018, an order was entered Approving the Settlement between the Debtors and FCB.  See Case No. 18-10752; Docket No. 122.

On April 5, 2018, FCB, Arthur Street,[1] Dr. Focazio,[2] Riverwood Surgical,[3] DVCO,[4] Focazio MD PA, Metropolitan,[5] Fox Hedge Manor, LLC ("Fox Hedge"),[6] and Endo Surgical (collectively, the "Obligors") entered into a forbearance agreement (the "First Forbearance") with FCB.

In the First Forbearance, DVCO, as well as other Obligors, acknowledged $12,928,803.14 total indebtedness due and owing to FCB as of March 1, 2018.  The Obligors, in exchange for a period of forbearance, agreed to make certain payments to FCB.

DVCO, as well as other obligors, received a credit of $4,700,000 reducing the indebtedness due to FCB as a result of transferring the Arthur Street property to FCB's designee through a deed-in-lieu of foreclosure.  After the Arthur Street transaction, the amount owed by the Debtors and other debtor and non-debtor entities was close to $8 million.  Such debt to FCB was secured by and cross-collateralized (and cross-default provisions) by all or substantially all of the Debtor's assets.

FCB has agreed to forbear from exercising its rights under the First Forbearance provided that DVCO and Obligors comply with the terms of the FCB Settlement (as described herein).

**2020 Forbearance Agreement and Settlement with FCB**

On January 24, 2020, FCB and DVCO entered into a Forbearance and Deed-in-Lieu of Foreclosure Agreement (the "Agreement").  FCB agreed to accept a deed-in-lieu of foreclosure of

---

[1] Non-debtor company owned by Dr. Focazio.
[2] Dr. Focazio filed a Chapter 11 bankruptcy on January 15, 2019, Case No. 19-10880.
[3] Non-debtor company owned by Dr. Focazio.
[4] Non-debtor company owned by Dr. Focazio.
[5] Non-debtor company owned by Dr. Focazio.
[6] Fox Hedge filed a Chapter 11 bankruptcy on August 9, 2019, Case No. 19-25457. Fox Hedge's case was dismissed on October 10, 2019.

the Property in partial fulfillment of the outstanding indebtedness.[7]  Title to the Property has been

conveyed by DVCO to FCB.

FCB has agreed to lease the Property to Focazio MD PA or Endo Surgical or an affiliate

(collectively, if applicable, the "Tenant(s)") approved by FCB.  The period of this tenancy will be

for no longer than two (2) years.  Extensions of the lease term must be mutually agreed by DVCO,

Tenant(s), and FCB.  If the buy-back option is not exercised (as described herein), Tenant(s) will

promptly vacate the premises at the expiration of the term leaving the premises in "broom clean"

condition.  Focazio MD PA and Endo Surgical can vacate at any time before the two-year option

and as long as they have not defaulted under the settlement Agreement, FCB waives and releases

any and all claims.

The Tenant(s) (Focazio MD PA and Endo Surgical) will be required to pay monthly rent

of $10,000 for the first (6) months of its tenancy (commencing February 15, 2020)[8]; $12,500 for

months (7) thru (12); $15,000 for months (13) thru (18) and; $17,500 for months (19) thru (24).

Tenant shall pay all utility costs incurred at the Property. Tenant(s) will be further required to

maintain insurance on the Property and pay a property tax escrow of $5,000 commencing with the

May 1, 2020, payment and every month thereafter throughout the remainder of the term.  DVCO

and Tenant(s) shall provide that the Property is continuously insured against loss and casualty.  A

separate lease agreement will be prepared for execution between FCB and Tenant(s).  Tenant(s)

shall not be permitted to sublease any portion of the Property without FCB's consent.

DVCO and FCB agreed to a purchase option agreement providing DVCO with the right to

---

[7] As set forth more fully herein, the terms and conditions of the FCB Settlement and Agreement, FCB agrees to waive
and release the remainder of its claims against all parties obligated under the Loan.  Such parties include, but not
limited to Dr. Focazio individually and Endo Surgical, both Debtors.   The Settlement was a key component to filing
the plans in all three Debtors' cases.   The waiver of over $8 million in secured and unsecured claims paved the way
to file such plans.
[8] The earlier payments were deferred because of COVID-19.

purchase the subject property back from FCB as follows:

- $3,200,000 if purchase transaction closes within six (6) months from the date of the buy-back option or;
- $3,300,000 if purchase transaction closes more than six (6) months from the date of the buy-back option but less than twelve (12) months from the date of the buy-back option or;
- $3,400,000 if purchase transaction closes more than twelve (12) months from the date of the buy-back option but less than eighteen (18) months from the date of the buy-back option or;
- $3,500,000 if purchase transaction closes more than eighteen (18) months from the date of the buy-back option but less than twenty-four (24) months from the date of the buy-back option;
- Any rights that DVCO has under the buy-back option will expire twenty-four (24) months from the date of the buy-back option.  The buy-back option may not be exercised in the event there is any breach of the per month payment obligations or there is a breach of the option agreement; and
- At the end of this twenty-four (24) month period, FCB will have no obligation to sell the property back to the seller.  Once the option period expires, DVCO and its designee shall have no further rights concerning the property and shall quit the property.

FCB and DVCO acknowledge that the real estate taxes on the Property were in arrears. FCB cured the arrearage for taxes due through the first half of 2020 on or before May 1, 2020. The outstanding taxes previously paid on the Property by FCB (and any subsequent tax payments) will increase the amount required to be paid by DVCO to FCB to purchase the property under the buy-back option.  FCB will not release its liens on any of the collateral property securing the obligations in the names of Grantor, Riverwood Surgical, Fox Hedge, William Focazio, or related entities and related party judgment-Debtor during the pendency of the buy-back option period (unless the option is exercised).  FCB preserves its rights to foreclose and pursue its remedies under the foreclosure judgment.

If the buy-back option is not exercised, FCB will release remaining liens and claims, in the approximate amount of $5 million, against Obligors, including, DVCO, Riverwood Surgical , Fox Hedge, Focazio MD PA, Endo Surgical, and Dr. Focazio, individually, only if both: (a) Tenant(s)

have vacated the premises leaving it in "broom clean" condition; and (b) DVCO has not defaulted under the terms of the Agreement.  If the buy-back option is exercised, FCB will release remaining liens and claims against Obligors, including, DVCO, Riverwood Surgical Center, Fox Hedge Manor, LLC, and Dr. Focazio in the approximate amount of $5 million (after a credit for the value of the Property) only if both: (a) Amounts specified in Buy-Back Option section are received by DVCO within the timeframe specified in each clause; and (b) all taxes, insurance, sheriff fees, costs, and other charges incurred by DVCO are fully reimbursed to FCB.  FCB will forbear from any further executions on outstanding judgments entered against Dr. Focazio and his related entities, including but not limited to Focazio MD PA and Endo Surgical, during the pendency of the buy-back option period, provided that Dr. Focazio and his related entities are not in default upon this agreement or prior forbearance agreement(s).

DVCO will have a twenty (20) day cure period for any payment due under the terms of the lease and buy-back agreement without notification from the grantor.  DVCO, Riverwood Surgical, Fox Hedge, Dr. Focazio, Endo Surgical, Focazio MD PA, and the related party judgment-Debtor shall indemnify, defend and hold FCB harmless for any and all claims made by the Passaic County Sheriff's Office for any fees, commissions, payment or other sums due, if any, to it concerning the sheriff sale or the Foreclosure Judgment obtained by FCB concerning the Property.

In bankruptcy cases of certain affiliates of DVCO (Dr. William Focazio, individually), as long as DVCO is not in default of the terms, FCB agrees to vote in favor of their plans that incorporates the terms of the Agreement (or agreements derived therefrom).  Thus, as noted, FCB is the dominant creditor by far and its support and wavier of claims is critical to reorganize.

As a result of the settlement, FCB alleges it is owed approximately $8,277,966 as of December 31, 2019.

On August 12, 2020, the Debtors amended their petitions to small business cases under Subchapter V of Chapter 11. Several parties objected, a hearing was held, and the election was denied. Nonetheless, the Debtors will now continue to proceed under Chapter 11 of the Bankruptcy Code and filed this amended plan which provides for the exact same treatment as set forth the Subchapter V plan that was filed and served on all creditors.

## 2.    Procedures Implemented to Resolve Financial Problems

To remedy the problems that led to the bankruptcy filing, the Debtors have, among other things, continued to streamline expenses. The Debtors are hopeful that upon exiting bankrutpcy and with their new contemplated doctors and unique disciplines, they will generate higher profit surgeries/services and increase the facility fees. The Debtors have entered into a Management Agreement (defined herein) which will enable the Debtors to emerge from bankruptcy and successfully reorganize.

## 3.    Current and Historical Conditions

**Focazio MD PA**

Attached as Exhibit B is Focazio MD PA's Monthly Operating Report for August 2020.

Focazio MD PA firmly believes it can return to its former profitability with the assistance of the Management Company. Focazio MD PA's income for the years 2008 through 2014 was as follows:

| Year | Income |
|------|--------|
| 2008 | $774,818.78 |
| 2009 | $622,711.88 |
| 2010 | $1,817,522.27 |
| 2011 | $3,120,751.28 |
| 2012 | $670,821.06 |
| 2013 | $605,163.22 |
| 2014 | $638,618.88 |

Focazio MD PA is confident that by teaming with the Management Company it can return to its former revenues and profits and grow exponentially. The cash infusion from the Management Company will be used for new equipment, payroll, expenses, marketing,

expansion, and funding plan payments.

**Endo Surgical**

Attached as Exhibit B is Endo Surgical's Monthly Operating Report for August 2020.

Endo Surgical firmly believes it can return to its former profitability with the assistance of the Management Company. Endo Surgical's income for the years 2008 through 2014 was as follows:

| Year | Income |
|------|--------|
| 2008 | $15,096,101.74 |
| 2009 | $20,206,503.32 |
| 2010 | $10,389,571.16 |
| 2011 | $8,888,068.35 |
| 2012 | $9,424,245.64 |
| 2013 | $6,734,417.37 |
| 2014 | $5,421,543.16 |

Endo Sugical is confident that with the assistance from the Management Company and increased opportunities it can return to its former revenues and profits and grow exponentially. The initial flow of cash from the Management Company will be used for new equipment, payroll, expenses, marketing, expansion, and funding plan payments.

## IV.

### SUMMARY OF THE PLAN OF LIQUIDATION

**A.      What Creditors Will Receive Under the Proposed Plan**

The Plan classifies claims in various classes. The Plan states whether each class of claims is impaired or unimpaired. The Plan provides the treatment each class will receive. A copy of the Plan is annexed hereto as **Exhibit A**.

**B.      Unclassified Claims**

Certain types of claims are not placed into voting classes. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Debtors have not placed the following claims in a class.

4848-8167-6242, v. 1

### 1.      Administrative Expenses and Fees

Administrative Expenses are claims for costs or expenses of administering the Debtors'
Chapter 11 Cases which are allowed under Bankruptcy Code section 503(b).  Fees payable to the
Clerk of the Bankruptcy Court and the Office of the United States Trustee were also incurred
during the Chapter 11 Case.  The Bankruptcy Code requires that all administrative expenses be
paid on the Effective Date of the Plan, unless a particular claimant agrees to different treatment.

Except if any Entity entitled to payment of an Allowed Administrative Expense Claim
agrees to a different treatment, each Holder of an Allowed Administrative Expense Claim will
receive Cash on the later of (a) the Effective Date and (b) the first Business Day after the date that
is 30 calendar days after the date such Administrative Expense Claim becomes an Allowed
Administrative Expense Claim.   Under the Debtors plan, Administrative Expenses Claims will
not be paid upon confirmation but will be paid in the plan over time in full.

### 2.      Fee Claims

The following chart lists all of the Debtors' unpaid fees and expenses ("Compensation")
and an estimate of future professional fees and other administrative claims and fees due under the
Plan:

**Focazio MD PA Claims**

| NAME | AMOUNT ESTIMATED | TREATMENT | TYPE OF CLAIM |
|---|---|---|---|
| Trenk, DiPasquale, Della Fera & Sodono P.C. | $22,685.11[9] | Payment in full on Effective Date, or through other agreement. | Administrative |
| McManimon, Scotland & Baumann, LLC | $50,000[10] | Payment in full on Effective Date, or through other agreement. | Administrative |
| Bederson, LLP | $97,000[11] | Payment in full on Effective Date, or through other agreement. | Administrative |
| Office of U.S. Trustee Fees | Approximately $4,243.92 | Payment in full on Effective Date. | Administrative |
| Expenses arising in the ordinary course of business after the Petition Date | Approximately $136,956.12 | Payment through the Plan as follows: payments over five (5) years: $2,282 monthly[12] | Administrative |
| **APPROXIMATE TOTAL** | $310,885.15 **(estimated)** | | |

---

[9] This amount is approximate amount owed up until and through September 30, 2018.

[10] This amount is estimated for fees through the Confirmation Date.

[11] This amount is estimated. There are additional fees through the Confirmation Date.

[12] All payments under the plan commence on the first day of the month following the 30th day after the plan becomes final and non-appealable ("Effective Date"). The initial payment shall be on the Effective Date.

22

**Endo Surgical Claims**

| NAME | AMOUNT ESTIMATED | TREATMENT | TYPE OF CLAIM |
|---|---|---|---|
| Trenk, DiPasquale, Della Fera & Sodono P.C. | $61,484.95 | Payment in full on Effective Date, or through other agreement. | Administrative |
| McManimon, Scotland & Baumann, LLC | $60,000[13] | Payment in full on Effective Date, or through other agreement. | Administrative |
| Bederson, LLP | $80,000 | Payment in full on Effective Date, or through other agreement. | Administrative |
| Rabinowitz, Lubetkin & Tully, LLC | Approximately $20,000 | Payment in full on Effective Date, or through other agreement. | Administrative |
| The Serruto Law Firm, P.C. special counsel | $24,120.50 | Payment in full on Effective Date, or through other agreement. | Administrative |
| Office of U.S. Trustee Fees | Approximately $10,137.76 | Payment in full on Effective Date. | Administrative |
| Expenses arising in the ordinary course of business after the Petition Date | Approximately $130,000 | Payment through the Plan as follows: payments over five (5) years: $2,166 monthly.[14] | Administrative |
| **APPROXIMATE TOTAL** | $385,743.21 **(estimated)** | | |

---

[13] This amount is estimated for additional fees through the Confirmation Date.

[14] All payments under the plan shall commence on the first day of the month following three (3) days after the plan becomes final and non-appealable (the "Effective Date").   The initial payment shall be on the Effective Date.

4848-8167-6242, v. 1

All entities seeking an award by the Bankruptcy Court of Fee Claims (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is 30 days after the Effective Date and (ii) shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (a) on the date upon which the Order relating to any such Allowed Fee Claim is entered, or (b) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or Plan Administrator, as applicable. The Reogranized Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

As indicated above, the Debtors will need to satisfy approximately $696,628.36 in Fee Claims as set forth in the Plan.

### 3. Priority Tax Claims

Priority tax claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8).  To the extent that such Claim has not been previously satisfied, each Holder of an Allowed Priority Tax Claim, if any, shall receive in full satisfaction of such Allowed Priority Tax Claim: (a) payment in Cash equal to the unpaid portion of such Allowed Priority Tax Claim within seven (7) Business Days after such Allowed Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as is practicable; or (b) Cash in an amount agreed to by the Debtors and such Holder; provided, however, that any Claim or demand for payment of a penalty (other than a penalty of the type specified in Section 507(a)(8)(G) of the Bankruptcy Code) shall be disallowed pursuant to this Plan and the Holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Debtor or the Estate.

24

The following chart provides an estimate of Priority Tax Claims for Focazio MD PA:[15]

- TAX CLAIMS - Per the Internal Revenue Service ("IRS") and State of New Jersey, Division of Taxation proofs of claim for taxes, they are owed as follows:   IRS POC #2 in the amount of $175,960.23 with a priority amount of $39,693.72; IRS POC #17 priority in the amount of $109,719.95; and IRS POC #21 in the amount of $171,020.23 with a priority amount of $30,013.72; STATE OF NJ POC #1 in the amount of $14,785.16;  State of New Jersey POC #4 priority in the amount of $3,129.67; State of New Jersey POC #5 in the amount of $9,977.38 with a priority amount of $9,250.87; State of New Jersey POC #14 priority in the amount of $23,420.72; State of New Jersey POC #19 in the amount of $19,093.15.  Debtor believes such claims total $297,895.76.[16] The Debtor shall make an initial payment of $25,000 to the IRS on the date of confirmation, and thereafter a balance of $272,895.76 remains.  Such claim balance shall receive equal monthly installments over sixty (60) months of $4,548.26 per month.  The initial $25,000 payment shall be made by the Management Company (defined below) and thereafter the payments over sixty (60) months shall be funded by the Reorganized Debtor and/or subsidized by the Management Company on an as needed basis.[17]

Below are the Focazio MD PA priority tax claims:

| Name of Taxing Authority and Type of Tax | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|
| Internal Revenue Service (POC 2) | $39,693.72 | | Such claims shall receive an initial pro rata payment of twenty-five thousand dollars ($25,000) on the date of confirmation and thereafter shall receive equal monthly installments over sixty (60) months.  The initial pro rata payment shall be made by the Management Company (defined below) and thereafter the payments over sixty (60) months shall be funded by the Reorganized Debtor and/or the Management Company on an as needed basis.[18] |

---

[15] All disputed and subject to further review.

[16] Based upon review of the IRS transcripts as of August 3, 2020, the Debtor believes $297,895.76 is the correct amount owed.  The Debtor will file a motion to fix the claims.

[17] The Management Company is committing up to $1 million to, among other things, subsidize and assist the Debtor in operations, expand its business, hire new employees and fund its plan.

[18] The Management Company is committing up to $1 million to assist and subsidize the Debtor in operations and fund its plan.

4848-8167-6242, v. 1

| Name of Taxing Authority and Type of Tax | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|
| State of New Jersey Division of Employer Accounts (POC 4) | $3,129.67 | | Such claims shall receive an initial pro rata payment of twenty-five thousand dollars ($25,000) on the date of confirmation and thereafter shall receive equal monthly installments over sixty (60) months.  The initial pro rata payment shall be made by the Management Company (defined below) and thereafter the payments over sixty (60) months shall be funded by the Reorganized Debtor and/or the Management Company on an as needed basis.[19] |
| State of New Jersey, Division of Taxation (POC 5) | $9,250.87 | | Such claims shall receive an initial pro rata payment of twenty-five thousand dollars ($25,000) on the date of confirmation and thereafter shall receive equal monthly installments over sixty (60) months.  The initial pro rata payment shall be made by the Management Company (defined below) and thereafter the payments over sixty (60) months shall be funded by the Reorganized Debtor and/or the Management Company on an as needed basis.[20] |

[19] The Management Company is committing up to $1 million to assist and subsidize the Debtor in operations and fund its plan.

[20] The Management Company is committing up to $1 million to assist and subsidize the Debtor in operations and fund its plan.

4848-8167-6242, v. 1

| Name of Taxing Authority and Type of Tax | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|
| State of New Jersey, Division of Employer Accounts (POC 14) | $23,420.72 | | Such claims shall receive an initial pro rata payment of twenty-five thousand dollars ($25,000) on the date of confirmation and thereafter shall receive equal monthly installments over sixty (60) months.  The initial pro rata payment shall be made by the Management Company (defined below) and thereafter the payments over sixty (60) months shall be funded by the Reorganized Debtor and/or the Management Company on an as needed basis.[21] |
| IRS  (POC 17) | $109,719.95 | | Such claims shall receive an initial pro rata payment of twenty-five thousand dollars ($25,000) on the date of confirmation and thereafter shall receive equal monthly installments over sixty (60) months.  The initial pro rata payment shall be made by the Management Company (defined below) and thereafter the payments over sixty (60) months shall be funded by the Reorganized Debtor and/or the Management Company on an as needed basis.[22] |

---

[21] The Management Company is committing up to $1 million to assist and subsidize the Debtor in operations and fund its plan.

[22] The Management Company is committing up to $1 million to assist and subsidize the Debtor in operations and fund its plan.

4848-8167-6242, v. 1

| Name of Taxing Authority and Type of Tax | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|
| IRS (POC 21) | $30,013.72 | | Such claims shall receive an initial pro rata payment of twenty-five thousand dollars ($25,000) on the date of confirmation and thereafter shall receive equal monthly installments over sixty (60) months. The initial pro rata payment shall be made by the Management Company (defined below) and thereafter the payments over sixty (60) months shall be funded by the Reorganized Debtor and/or the Management Company on an as needed basis.[23] |

**Endo Surgical Priority Tax Claims**

- Per the  Internal Revenue Service ("IRS") and State of New Jersey, Division of Taxation proofs of claim for taxes, they are owed as follows:   IRS – POC #7 in the amount of $434,985.56 with priority being in the amount of $309,343.87; and POC #32 priority in the amount of $20,073.76; State of NJ POC #3 in the amount of $60,164.36; POC #12 priority in the amount of $503.29; POC #27  priority in the amount of $9,738.33; POC #34 priority in the amount of $1,093.74; and POC #36 priority in the amount of $6,460.98.   Debtor believes such claims total $508,541.94[24]. Such claims shall receive an initial pro rata payment of $50,000 on the date of confirmation and thereafter remains $458,541.94.  They shall receive equal monthly installments over sixty (60) months of $ 7,642.36 per month until the debt is satisfied.  The initial $50,000 payment shall be made by the Management Company (defined below) and thereafter the payments over sixty (60) months shall be funded by the Reorganized Debtor and/or the Management Company on an as needed basis.[25]
-
  Below are Endo Surgical's priority tax claims:

---

[23] The Management Company is committing up to $1 million to assist and subsidize the Debtor in operations and fund its plan.

[24] Debtor believes claims total $508,541.94 based on review of transcripts.  Debtor will file a motion to fix claims.

[25] The Management Company is committing up to $1 million to, among other things, subsidize and assist the Debtor in operations, expand its business, hire new employees and fund its plan.

4848-8167-6242, v. 1

| Name of Taxing Authority and Type of Tax | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|
| Internal Revenue Service (POC 7-4) | $309,343.87 | | Such claims shall receive an initial pro rata payment of fifty thousand dollars ($50,000) on the date of confirmation and thereafter shall receive equal monthly installments over sixty (60) months. The initial pro rata payment shall be made by the Management Company (defined below) and thereafter the payments over sixty (60) months shall be funded by the Reorganized Debtor and/or the Management Company on an as needed basis.[26] |
| State of New Jersey, Division of Taxation (POC 12) | $503.29 | | Such claims shall receive an initial pro rata payment of fifty thousand dollars ($50,000) on the date of confirmation and thereafter shall receive equal monthly installments over sixty (60) months. The initial pro rata payment shall be made by the Management Company (defined below) and thereafter the payments over sixty (60) months shall be funded by the Reorganized Debtor and/or the Management Company on an as needed basis.[27] |

---

[26] The Management Company is committing up to $1 million to assist the Debtor in operations and fund its plan.
[27] The Management Company is committing up to $1 million to assist the Debtor in operations and fund its plan.

4848-8167-6242, v. 1

| Name of Taxing Authority and Type of Tax | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|
| State of New Jersey, Employer Accounts (POC 27-9) | $9,738.83 | | Such claims shall receive an initial pro rata payment of fifty thousand dollars ($50,000) on the date of confirmation and thereafter shall receive equal monthly installments over sixty (60) months.  The initial pro rata payment shall be made by the Management Company (defined below) and thereafter the payments over sixty (60) months shall be funded by the Reorganized Debtor and/or the Management Company on an as needed basis.[28] |
| Internal Revenue Service (POC 32-2) | $20,073.76 | | Such claims shall receive an initial pro rata payment of fifty thousand dollars ($50,000) on the date of confirmation and thereafter shall receive equal monthly installments over sixty (60) months.  The initial pro rata payment shall be made by the Management Company (defined below) and thereafter the payments over sixty (60) months shall be funded by the Reorganized Debtor and/or the Management Company on an as needed basis.[29] |

---

[28] The Management Company is committing up to $1 million to assist the Debtor in operations and fund its plan.
[29] The Management Company is committing up to $1 million to assist the Debtor in operations and fund its plan.

4848-8167-6242, v. 1

| Name of Taxing Authority and Type of Tax | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|
| State of New Jersey, Division of Employer Accounts (POC 34) | $1,093.74 | | Such claims shall receive an initial pro rata payment of fifty thousand dollars ($50,000) on the date of confirmation and thereafter shall receive equal monthly installments over sixty (60) months. The initial pro rata payment shall be made by the Management Company (defined below) and thereafter the payments over sixty (60) months shall be funded by the Reorganized Debtor and/or the Management Company on an as needed basis.[30] |
| State of New Jersey, Division of Taxation (POC 36) | $6,460.98 | | Such claims shall receive an initial pro rata payment of fifty thousand dollars ($50,000) on the date of confirmation and thereafter shall receive equal monthly installments over sixty (60) months. The initial pro rata payment shall be made by the Management Company (defined below) and thereafter the payments over sixty (60) months shall be funded by the Reorganized Debtor and/or the Management Company on an as needed basis.[31] |

On November 10, 2020, this Court entered a Stipulation and Consent Order Resolving Objections of the Internal Revenue Service ("IRS") to Debtors' Plans of Reorganization (Doc. No. 449) (the "Stipulation"). The Terms of the Stipulation are as follows:

---

[30] The Management Company is committing up to $1 million to assist the Debtor in operations and fund its plan.
[31] The Management Company is committing up to $1 million to assist the Debtor in operations and fund its plan.

4848-8167-6242, v. 1

1.     The Debtors shall tender $100,000 to the IRS for payment of the IRS' administrative claims on the effective date of the Amended Plan.  The $100,000 shall be paid collectively fromEndo Surgical,Focazio MD PA, and Dr. Focazio individually.

2.     Payment of the balance of IRS' administrative claims (approximately $75,000) shall be paid over five (5) years in equal monthly installments including interest. All other payments due to the IRS, as reflected in IRS' filed proofs of claim, shall be paid in accordance with the Amended Plan.  The Amended Plan shall pay in full, and include post-confirmation interest on, all administrative, priority and secured (if any) amounts owed to the IRS per the federal statutory interest rate of three percent (3%).  Based on the Debtors' representations to IRS regarding the current value of the Debtors' assets, IRS anticipates that it will reclassify substantial portions of its secured claims against the Debtors as priority claims pursuant to 11 U.S.C. § 507(d).

3.      Payments to the IRS shall be due the 1st of each month starting with the month following the order confirming the Amended Plan becoming final and non-appealable.  The IRS has the right to file a certification of default for the following reasons: (i) the IRS is not timely paid on any amounts due under the Amended Plan or such payments are not cured within fourteen (14) days after payments are due, (ii) the Debtors fail to remain current post-confirmation on filing all quarterly returns, or (iii) Debtors fail to make any required federal tax deposits.  Upon the filing of a certification of default, the Debtors shall have five (5) days to either file a notice specifically disputing that a default has occurred or to file a notice that such default has been cured. If the Debtors do not such file such a notice within five (5) days of IRS' filing of a certification of default, then the Court shall enter an order converting these chapter 11 cases to chapter 7.

4.     On a going forward basis, to enable IRS to promptly determine whether the Debtors are timely filing Form 940 and Form 941 returns and making required deposits thereunder, the

Debtors shall cause signed copies of such returns (or, if electronically filed, proof of such electronic filing) and proof of payment of deposits to be sent by facsimile to IRS Bankruptcy Specialist George Hellerman at following facsimile number: (855) 639-7682.  In the event the Debtors fail to make any deposits under Form 940 and 941 on the basis that the Debtors had no payroll for a given period, the Debtors shall cause an affidavit to that effect to be sent by facsimile to Mr. Hellerman in the same manner.

   5.  The IRS supports the Debtors' Amended plan as modified by this order.

   6.  If a dispute arises under the terms of this Stipulation and Consent Order, the Debtors and the IRS consent to the jurisdiction of the Bankruptcy Court to resolve such dispute.

4848-8167-6242, v. 1

### C.    Classified Claims and Interests

### 1.    Classes of Secured Claims

Secured claims are claims secured by liens on property of the estate.  If there are assets available, the below creditors will be paid upon the priority they should receive, otherwise they will be treated as an unsecured claim.

### Focazio MD PA

- SECURED CLAIMS - First Commerce Bank ("FCB") is owed in excess of $7,671,243.94, however, FCB's claim is contingent and shall be waived and released in accordance with a settlement agreement approved by the court May 20, 2020 (Doc. 391).  FCB has also agreed to vote its claim in favor of the Debtor's plan as well as in the plans of the related debtors – William J Focazio (Case No. 19-10880) and Endo Surgical Center of North Jersey (Case No. 18-10753) (collectively, all three cases are referred to as the "Debtors").[32]  FCB is secured by all or substantially all of the Debtors' assets.  In addition, FCB has a substantial unsecured claim in all of the Debtors' cases.

### Endo Surgical

- SECURED CLAIMS – First Commerce Bank ("FCB") is owed in excess of $7,671,243.94, however, FCB's claim is contingent and shall be waived and released in accordance with a settlement agreement approved by the court on May 20, 2020 (See Case No. 18-10752; Doc. 391).  FCB has also agreed to vote its claim in favor of the Debtor's plan as well as in the plans of the related debtors – William J Focazio (Case No. 19-10880) and William Focazio, MD, P.A. (Case No. 18-10752) (collectively, all three cases are referred to as the "Debtors").[33]  FCB is secured by all or substantially all of the Debtors assets.  In addition, FCB has a substantial unsecured claim in all of the Debtors' cases.

### 2.    Classes of Priority Unsecured Claims

Certain priority claims that are referred to in Bankruptcy Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes. These types of claims are entitled to priority treatment as follows:  the Bankruptcy Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim.  However, a class of unsecured

---

[32] The claims in the Debtors' cases are virtually similar so payments in one case may be utilized to pay off debt in another case.   Thus, the collective pro rata payment to unsecured creditors will be $600,000, which is an approximate 10% distribution.

[33] The claims in the Debtors' cases are virtually similar so payments in one case may be utilized to pay off debt in another case.

priority claim holders may vote to accept deferred cash payments of a value, as of the Effective

Date, equal to the allowed amount of such claims.

The Debtor does not have any such claims.

### 3.    Class of General Unsecured Claims

General unsecured claims are uncollateralized claims not entitled to priority under Code

Section 507(a).  The following chart identifies this Plan's treatment of the class containing all of

Debtor' general unsecured claims:

**Focazio MD PA**

- UNSECURED CREDITORS - Unsecured creditors are owed approximately $3,237,000.[34]
  Unsecured creditors shall be paid pro rata $150,000 of their allowed claims over eight (8)
  years. Payments will be made by the Reorganized Debtor and/or subsidized by
  Management Company on an as needed basis.  Such payment shall be in the amount of
  $1,562.50 monthly.

**Endo Surgical**

- UNSECURED CREDITORS - Unsecured creditors are approximately $6,000,000 in all
  Debtors' cases collectively.  Unsecured creditors shall be paid pro rata $300,000 of their
  allowed claims over eight (8) years on a monthly basis. Payments will be made by the
  Reorganized Debtor and/or Management Company on an as needed basis.  Such payment
  shall be in the amount of $3,125 monthly.

### 4.    Class of Interests

Dr. Focazio will be retaining his equity interest in Focazio MD PA and Endo Surgical.

### D.    Means of Effectuating the Plan

### 1.  Funding for the Plan

**Focazio MD PA**

The Reorganized Debtor is entering into a management agreement ("Management Agreement")
with RJ Capital Med, LLC ("RJ Capital" or the "Management Company") to provide operational
cash and subsidize payment to certain creditors in the plan on an as needed basis.  The Management

---

[34] The Debtor acknowledges the $3 million claim filed by Allstate New Jersey Property & Casualty Insurance, Claim
No. 18, however, such claim shall be treated in the Endo Surgical plan.  The Allstate claim is not included in the
$3,237,000.

Company will also provide capital to expand operations and operating capital. RJ Capital is owned and operated by Rudy Abramov. Neither RJ Capital nor Mr. Abramov or any entity he owns, or controls has a relationship with the Debtors or Dr. Focazio, individually or any owned or controlled by or affiliated with Dr. Focazio.

The terms of the Management Agreement are as follows:

- Management Company to pay $25,000 towards priority tax claims and $50,000 towards administrative expenses are set forth above upon confirmation of the plan. The Management Company shall also subsidize the payments required under the plan on an as needed basis.
- Management Company is committed to subsidize up to $1 million to assist and subsidize the Debtor with its operational needs and fund certain payments under the Plan, expand Debtor's business and increase revenues as needed.
- The Management Company shall receive a monthly management fee of sixty percent (60%) from net profits.

## Endo Surgical

The Reorganized Debtor is also entering into the Management Agreement with RJ Capital to provide operational cash and subsidize payment to certain creditors in the plan on an as needed basis. It will also work with the Debtor and provide capital to expand operations. RJ Capital is owned and operated by Rudy Abramov. Neither RJ Capital nor Mr. Abramov or any entity he owns, or controls, has a relationship with the Debtors or Dr. Focazio, individually, or any owned or controlled by or affiliated with Dr. Focazio.

The terms of the Management Agreement are as follows:

- Management Company to pay $150,000 towards priority tax claims and administrative expenses as set forth above upon confirmation of the plan. The Management Company shall also subsidize other payments required under the plan on an as needed basis.
- Unsecured creditors are to be paid $300,000 pro rata on their allowed claims over eight (8) years on a monthly basis. Payments will be made by the Reorganized Debtor through operations and/or the Management Company will subsidize such payments as required.
- Management Company is committed to subsidize up to $1 million to assist and subsidize the Debtors with their operational needs, fund payments under the Plan, expand Debtor's business and increase revenues.
- The Management Company shall receive a monthly management fee of sixty percent (60%) from net profits.[35]

### E.    Other Provisions of the Plan

#### 1.    Executory Contracts and Unexpired Leases

Executory Contracts are contracts where significant performance of the contract remains

---

[35] See footnote 40.

4848-8167-6242, v. 1

for both the Debtor and another party to the contract. The Debtor has the right to reject, assume (i.e. accept), or assume and assign these types of contracts to another party, subject to the Bankruptcy Court's approval. The paragraphs below explain the Debtor's intentions regarding its Executory Contracts (which includes its unexpired leases) and the impact such intentions would have on the other parties to the contracts.

The agreement with FCB is an executory contract as the month to month lease and the option to buy is executory.  See Doc. No. 391.

The Debtor holds a contract with Son Rise for the maintenance/rental of copy machines and printers.  Son Rise also holds a contract with the affiliated debtor – Endo Surgical.

All proofs of claim with respect to claims arising from said rejection must be filed with the Bankruptcy Court within the earlier of (i) the date set forth for filing claims in any order of the Bankruptcy Court approving such rejection or (ii) thirty (30) days after the Confirmation Date.  Any such claims, proofs of which are not filed timely, will be barred forever from assertion.

### 2.        Changes in Rates Subject to Regulatory Commission Approval

The Debtors are not subject to governmental regulatory commission approval of their rates.

### 3.        Retention of Jurisdiction

The Court shall retain jurisdiction of this case pursuant to the provisions of Chapter 11 of the Code, pending the final allowances or disallowances of all Claims effected by the Plan, and with respect to the following matters:

(a)    To enable the Debtors to consummate the Plan and to resolve any disputes arising therefrom;

(b)    To adjudicate all controversies concerning the classification, estimation or allowance of any Claim herein;

(c)    To make such Orders as are necessary or appropriate to implement the provisions of this Plan;

(d)    To determine the classification, estimation and priority of all claims against the Debtors and to re-examine any Claims which may have been allowed;

(e)    To determine applications for the rejection or assumption of executory contracts or unexpired leases pursuant to the provisions of this Plan which are not determined prior to the

4848-8167-6242, v. 1

Confirmation date and to determine allowance of Claims for damages with respect to rejection of any such executory contracts or unexpired leases within such time as the Court may direct;

(f)    To oversee and issue further appropriate orders respecting disbursement of amounts deposited as may be required by this Plan;

(g)    To conduct hearings on valuation, as necessary, and to determine whether any party in interest is entitled to recover against any Person any Claim, whether arising under Section 506(c) of the Bankruptcy Code, or arising out of a voidable preference, a fraudulent transfer, or otherwise;

(h)    To hear and determine all applications for compensation and other Administrative Expenses;

(i)    To hear and determine any and all pending adversary proceedings or contested matters;

(j)    To determine all causes of action which may exist in favor of the Debtors ;

(k)    To determine any modification of the Plan after confirmation pursuant to Section 1127 of the Code;

(l)    To enter any order, including injunctions, necessary to establish and enforce the rights and powers of the Debtors under the Plan;

(m)    To enter a final decree pursuant to Rule 3022 of the Bankruptcy Rules.

(n)    To hear and determine all controversies, suits and disputes, if any, as may arise in connection with the interpretation or enforcement of the Plan;

(o)    To hear and determine all controversies, suits and disputes, if any, as may arise with regard to orders of Bankruptcy Court in the Chapter 11 Case entered on or before the Confirmation Date;

(p)    To hear and determine any and all controversies and disputes arising under, or in connection with, the Plan;

(q)    To hear and determine any and all objections to payments under the Plan;

(r)    To liquidate damages in connection with any disputed, contingent or unliquidated Claims;

(s)    To adjudicate all Claims to a security or ownership interest in any property of the Debtors or in any proceeds thereof;

(t)    To adjudicate all causes of action to recover all assets and properties of the Debtors wherever located;

(u)    To enter any order, including injunctions necessary to enforce the title, rights and powers of the Debtors, and to impose such limitations, restrictions, terms and conditions on such title rights and powers as the Bankruptcy Court may deem necessary or appropriate; and

(v)    To make such orders as are necessary or appropriate to carry out the provisions of the Plan, including but not limited to orders interpreting, or enforcing the provisions thereof.

**4.    Procedures for Resolving Contested Claims**

Any other party in interest shall have sixty (60) days subsequent to confirmation to object to the allowance of claims. The bar date for submission of claims was **May 22, 2018**. The Debtors reserve the right to object to any and all claims which have been filed or which may be filed.

**5.    Effective Date**

**The Plan will become effective on the Effective Date which shall be the 1st day of the month following the date which is thirty (30) days after the date on which the order of confirmation becomes final.**

**6.    Modification**

The Debtors may alter, amend or modify the Plan at any time prior to the Confirmation Date and thereafter as provided in Section 1127(b) of the Bankruptcy Code.

4848-8167-6242, v. 1

**F.      Tax Consequences of Plan**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY

AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS,

ATTORNEYS, AND/OR ADVISORS.  The following disclosure of possible tax consequences

is intended solely for the purpose of alerting readers to possible tax issues this Plan may present to

Debtor. The Debtors CANNOT and DO NOT represent that the tax consequences contained below

are the only tax consequences of the Plan because the Tax Code embodies many complicated rules

which make it difficult to state completely and accurately all the tax implications of any action.

The following are the tax consequences that the Plan will have on the Debtors' tax liability:

None anticipated.

Since the Debtors are an S Corporation, there are no federal tax consequences.  The State

of New Jersey has a small tax on S corps which is a fee multiplied by the number of shareholders

which will be minimal

**G.      Risk Factors**

The following discussion is intended to be a non-exclusive summary of certain risks

attendant upon the consummation of the Plan.  You are encouraged to supplement this summary with

your own analysis and evaluation of the Plan and Disclosure Statement, in their entirety, and in

consultation with your own advisors.  Based on the analysis of the risks summarized below, the

Debtor believe that the Plan is viable and will meet all requirements of confirmation.

There are no known risks at this time other than the normal risks associated with operating

a business.

4848-8167-6242, v. 1

# V.

## CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims.  The Debtors CANNOT and DO NOT represent that the discussion contained below is a complete summary of the law on this topic.

**A.    Who May Vote or Object to the Debtor's Plan of Reorganization**

**1.    Who May Object to Confirmation of the Plan**

Any party in interest may object to the confirmation of the Plan, but, as explained below, not everyone is entitled to vote to accept or reject the Plan.

**2.    Who May Vote to Accept/Reject the Plan**

A creditor has a right to vote for or against the Plan if that creditor has a claim that is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

**a. What Is an Allowed Claim**

As noted above, a creditor must first have an <u>allowed claim</u> to have the right to vote. Generally, any proof of claim will be allowed, unless a party in interest brings a motion objecting to the claim.  When an objection to a claim is filed,[36] the creditor holding the claim cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim for voting purposes.

---

[36] Focazio MD PA and Endo Surgical intend to file a motion to object, dispute or reduce certain claims.

THE BAR DATE FOR FILING A PRE-PETITION PROOF OF CLAIM IN THIS CASE WAS **May 22, 2018**.

A creditor may have an allowed claim even if a proof of claim was not timely filed. A claim is deemed allowed if (1) it is scheduled on the Debtors' schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim.

### b. What Is an Impaired Claim

As noted above, an allowed claim has the right to vote if it is in a class that is impaired under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of their claim plus interest.

Parties who dispute the Debtor's characterization of their claim as being impaired or unimpaired may file an objection to the Plan contending that the Debtors have incorrectly characterized the class.

### 3. Who Is Not Entitled to Vote

The following four types of claims are not entitled to vote: (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Code Section 507(a)(1), (a)(2), and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Except as otherwise provided, claims entitled to priority pursuant to Code Section 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

4848-8167-6242, v. 1

### 4. Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

### 5. Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed later in Section (IV.A.7).

### 6. Votes Necessary for a Class to Accept the Plan

A class of claims is considered to have accepted the Plan when more than one-half (½) in number and at least two-thirds (2/3) in dollar amount of the allowed claims that actually voted, voted in favor of the Plan.

### 7. Treatment of Nonaccepting Classes

As noted above, even if all impaired classes do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required by the Code.  The process by which nonaccepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown".  The Code allows the Plan to be "crammed down" on nonaccepting classes of claims if it meets all consensual requirements except the voting requirements of section 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. §1129(b) and applicable case law.

4848-8167-6242, v. 1

**8.      Request for Confirmation Despite Nonacceptance by Impaired Class(es)**

The party proposing this Plan asks the Court to confirm this Plan by cramdown on impaired

classes if any of these classes do not vote to accept the Plan.

**H.      Liquidation Analysis**

Another confirmation requirement is the "Best Interest Test," which requires a liquidation

analysis.  Under the Best Interest Test, if a claimant is in an impaired class and that claimant does not

vote to accept the Plan, then that claimant must receive or retain under the Plan property of a value not

less than the amount that such holder would receive or retain if the Debtor's assets were liquidated

under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee. Secured

creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien.

Administrative claims are paid next.  Next, unsecured creditors are paid from any remaining sales

proceeds, according to their rights to priority.  Unsecured creditors with the same priority share in

proportion to the amount of their allowed claims.

For the Court to be able to confirm this Plan, the Court must find that all creditors who do

not accept the Plan will receive at least as much under the Plan as such holders would receive under

a Chapter 7 liquidation. The Debtor maintains that this requirement is met here for the following

reasons:

Conversion of the case to Chapter 7 will substantially delay the dividend, if any, to creditors

herein and result in an additional layer of administrative expenses associated with Chapter 7

Trustee's commissions and the professional fees of the Chapter 7 Trustee which will be paid before

priority unsecured and general unsecured creditors receive their pro rata share of available estate

assets.  As such, the Debtor believes that secured, priority unsecured and general unsecured

creditors are better off by the liquidation of the estate assets and payment of the claims of creditors

in accordance with its Chapter 11 Plan of Liquidation, as opposed to conversion of the case to a

proceeding under Chapter 7.  In Chapter 7 liquidation, general unsecured creditors will receive <u>no</u>

dividend.

### Focazio MD PA

*Debtor's Estimated Liquidation Value of Assets*

| | |
|---|---|
| a. Cash on hand | $2,000 |
| b. Accounts receivable | $499,414.81[37] |
| c. Inventory | $100 |
| d. Office furniture | $4,500 |
| e. Machinery & equipment | $4,000 |
| f. License | $10,000 |
| | |
| ***Total Assets at Liquidation Value*** | $ |
| | |
| **Less:** Secured creditors' recoveries | $7,000,000 |
| **Less:** Chapter 7 trustee fees and expenses | $ |
| **Less:** Chapter 11 Administrative Expenses | $385,000 |
| **Less:** Priority claims, excluding Administrative Expense claims | $ |
| [**Less:** Debtor's claimed exemptions] | $ |
| | |
| (1) Balance for unsecured claims | $ |
| | |
| (2) Total dollar amount of unsecured claims | $ |

---

[37] Per the Petition, however, the receivables are aged and will be difficult to collect.

4848-8167-6242, v. 1

**Endo Surgical**

*Debtor's Estimated Liquidation Value of Assets*

**Assets**

| | |
|---|---|
| a. Cash on hand | $3,000 |
| b. Accounts receivable | 1,100,000[38] |
| c. Office furniture & Equipment[39] | $1,500 |
| d. License (owned by Focazio MD PA) | $0 |

| | |
|---|---|
| *Total Assets at Liquidation Value* | $0 |

| | |
|---|---|
| **Less:** Secured creditors' recoveries | $7,000,000 |
| **Less:** Chapter 7 trustee fees and expenses | $ |
| **Less:** Chapter 11 Administrative Expenses | $ |
| **Less:** Priority claims, excluding Administrative Expense claims | $ |
| [**Less:** Debtor's claimed exemptions] | $0 |
| (1) Balance for unsecured claims | $ |
| (2) Total dollar amount of unsecured claims | $6,000,000 |

---

[38] As of Petition Date, however, collectability is highly questionable due to several reasons due in part to inexperienced and careless staff leading to faulty infrastructure and certain issues with insurance companies

[39] Pursuant to a Lien in favor of FCB.

4848-8167-6242, v. 1

## I.     Feasibility

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of Debtor or any successor to Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis.  The first aspect considers whether Debtors will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses that are entitled to be paid on such date.  The Debtors maintain that this aspect of feasibility is satisfied as illustrated here, based upon the value of the Debtors' assets.

The second aspect considers whether the Debtors will have enough cash over the life of the Plan to make the required Plan payments.

### Focazio MD PA

Focazio MD PA believes it will experience an increase in net revenues of 17% per month for the next sixty (60) months.   This is based on 430 patients monthly.   Net monthly revenue will increase by $67,388 with expenses of $55,709 resulting in a net monthly profit of $11,679 – a 17% increase.  Accordingly, over the next sixty (60) months, the Debtor expects 25,800 additional patients, $4,043,488 in gross revenue, $3,342,516 in expenses and $700,972 in net revenues equating to 17% increase in net profits.

### Endo Surgical

Below is a chart indicating the number of patients, revenue, and expenses Endo Surgical expects over the next sixty (60) months.

| ENDO | | | | | |
|---|---|---|---|---|---|
| Month | # patients | Revenue | Expenses | Net | Net/Revenue |
| 1 | 258 | $263,500 | $245,553 | $17,947 | 7% |

| 2 | 258 | $263,500 | $245,553 | $17,947 | 7% |
|---|---|---|---|---|---|
| 3 | 258 | $263,500 | $245,553 | $17,947 | 7% |
| 4 | 258 | $263,500 | $245,553 | $17,947 | 7% |
| 5 | 258 | $263,500 | $245,553 | $17,947 | 7% |
| 6 | 258 | $263,500 | $245,553 | $17,947 | 7% |
| 7 | 258 | $263,500 | $245,553 | $17,947 | 7% |
| 8 | 258 | $263,500 | $245,553 | $17,947 | 7% |
| 9 | 258 | $263,500 | $245,553 | $17,947 | 7% |
| 10 | 258 | $263,500 | $245,553 | $17,947 | 7% |
| 11 | 258 | $263,500 | $245,553 | $17,947 | 7% |
| 12 | 258 | $263,500 | $245,553 | $17,947 | 7% |
| 13 | 263 | $263,500 | $245,553 | $17,947 | 7% |
| 14 | 263 | $263,500 | $245,553 | $17,947 | 7% |
| 15 | 263 | $263,500 | $245,553 | $17,947 | 7% |
| 16 | 263 | $266,000 | $245,553 | $20,447 | 8% |
| 17 | 263 | $266,000 | $245,553 | $20,447 | 8% |
| 18 | 263 | $266,000 | $245,553 | $20,447 | 8% |
| 19 | 263 | $266,000 | $245,553 | $20,447 | 8% |
| 20 | 263 | $266,000 | $245,553 | $20,447 | 8% |
| 21 | 263 | $266,000 | $245,553 | $20,447 | 8% |
| 22 | 263 | $266,000 | $245,553 | $20,447 | 8% |
| 23 | 263 | $266,000 | $245,553 | $20,447 | 8% |
| 24 | 263 | $266,000 | $245,553 | $20,447 | 8% |
| 25 | 269 | $266,000 | $245,553 | $20,447 | 8% |
| 26 | 269 | $266,000 | $245,553 | $20,447 | 8% |
| 27 | 269 | $274,000 | $245,553 | $28,447 | 10% |
| 28 | 269 | $274,000 | $245,553 | $28,447 | 10% |
| 29 | 269 | $274,000 | $245,553 | $28,447 | 10% |
| 30 | 269 | $274,000 | $245,553 | $28,447 | 10% |
| 31 | 269 | $274,000 | $245,553 | $28,447 | 10% |
| 32 | 269 | $274,000 | $245,553 | $28,447 | 10% |
| 33 | 269 | $274,000 | $245,553 | $28,447 | 10% |
| 34 | 269 | $274,000 | $245,553 | $28,447 | 10% |
| 35 | 269 | $274,000 | $245,553 | $28,447 | 10% |
| 36 | 269 | $274,000 | $245,553 | $28,447 | 10% |
| 37 | 280 | $274,000 | $245,553 | $28,447 | 10% |
| 38 | 280 | $274,000 | $245,553 | $28,447 | 10% |
| 39 | 280 | $279,500 | $245,553 | $33,947 | 12% |
| 40 | 280 | $279,500 | $245,553 | $33,947 | 12% |
| 41 | 280 | $279,500 | $245,553 | $33,947 | 12% |
| 42 | 280 | $279,500 | $245,553 | $33,947 | 12% |

4848-8167-6242, v. 1

| 43 | 280 | $279,500 | $245,553 | $33,947 | 12% |
|---|---|---|---|---|---|
| 44 | 280 | $279,500 | $245,553 | $33,947 | 12% |
| 45 | 280 | $279,500 | $245,553 | $33,947 | 12% |
| 46 | 280 | $279,500 | $245,553 | $33,947 | 12% |
| 47 | 280 | $279,500 | $245,553 | $33,947 | 12% |
| 48 | 280 | $279,500 | $245,553 | $33,947 | 12% |
| 49 | 290 | $279,500 | $245,553 | $33,947 | 12% |
| 50 | 290 | $279,500 | $245,553 | $33,947 | 12% |
| 51 | 290 | $288,000 | $245,553 | $42,447 | 15% |
| 52 | 290 | $288,000 | $245,553 | $42,447 | 15% |
| 53 | 290 | $288,000 | $245,553 | $42,447 | 15% |
| 54 | 290 | $288,000 | $245,553 | $42,447 | 15% |
| 55 | 290 | $288,000 | $245,553 | $42,447 | 15% |
| 56 | 290 | $288,000 | $245,553 | $42,447 | 15% |
| 57 | 290 | $288,000 | $245,553 | $42,447 | 15% |
| 58 | 290 | $288,000 | $245,553 | $42,447 | 15% |
| 59 | 290 | $288,000 | $245,553 | $42,447 | 15% |
| 60 | 290 | $288,000 | $245,553 | $42,447 | 15% |
| **TOTAL** | **16,320** | **$16,400,500** | **$14,733,205** | **$1,667,295** | **10%** |

The Debtor's financial projections are feasible based upon their financial records maintained by Debtors prior to and during the pendency of the bankruptcy case and anticipated future business.

Accordingly, the Debtors' Plan is feasible.

## VI.

## EFFECT OF CONFIRMATION OF PLAN

### A.    Discharge

The Plan provides that upon confirmation of the Plan, the Debtors shall be discharged of liability for payment of debts incurred before confirmation of the Plan, to the extent specified in 11 U.S.C. §1141. However, any liability imposed by the Plan will not be discharged.  If Confirmation of the Plan does not occur or if, after Confirmation occurs, the Proponents elect to terminate the Plan, the Plan shall be deemed null and void.  In such event, nothing contained in the Plan shall be deemed

to constitute a waiver or release of any claims against the Debtors or their estate or any other persons, or to prejudice in any manner the rights of the Debtors or their estate or any person in any further proceeding involving the Debtors or their estate.  The provisions of the Plan shall be binding upon Debtors, the Proponents, all creditors and all equity interest holders, regardless of whether such claims or equity interest holders are impaired or whether such parties accept the Plan, upon Confirmation thereof.  Moreover, any judgments docketed against the Debtors in the State of New Jersey and any county or subdivision thereof will be expunged upon confirmation of the Plan.

**B.**    **Release of Claims**

**1.**    **Release**

Except as otherwise expressly provided for in this Plan, the distributions and rights afforded in the Plan shall be complete and full satisfaction and release, effective as of the Effective Date, of all Claims against the Debtors or any of their assets or properties of any nature whatsoever. Commencing on the Effective Date, except as otherwise expressly provided for in this Plan, all Claimants are forever releasing, waiving, and discharging and shall be precluded forever from asserting against the Debtors of any other or further claims, obligations, suits, judgments, liens, encumbrances, damages, debts, rights, causes of action, and liabilities whatsoever arising on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' business or affairs, this Chapter 11 Case, or the Plan, including but not limited to all principal and accrued and unpaid interest on the debts of the Debtors based on any act or omission, transaction or other activity or security instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date, that was or could have been the subject of any Claim, whether or not Allowed; provided, however, that such release, waiver and discharge shall not apply in any respect to any acts or omission that are the result of fraud, gross negligence or willful misconduct by the Debtors from the Petition Date to the Effective Date.

4848-8167-6242, v. 1

On and after the Effective Date, as to every Claim, every Holder of a Claim shall be precluded from asserting against the Debtors for any further Claim based on any document, instrument, act, omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

Pursuant to Bankruptcy Rule 9019, confirmation of the Plan shall constitute, and all consideration distributed under this Plan shall be in exchange for and in complete satisfaction, settlement, and release of and an injunction against, all as of the Effective Date, any and all Claims, demands, allegations or causes of action, against the Debtors and their respective agents, representatives, officers, shareholders, members, employees, financial advisors, accountants, attorneys, or employees for any liability for actions taken or omitted to be taken in good faith under or in connection with the Plan or in connection with the Chapter 11 case or the operation of the Debtors during the pendency of the Chapter 11 case.

## 2.       Settlement of Claims and Controversies; General Injunction

The provisions of the Plan shall constitute a good faith compromise and settlement of claims or controversies relating to the contractual and legal rights that a Holder of a Claim may have with respect to any Claim, or any distribution to be made on account of such an Allowed Claim.

Except as otherwise provided in the Plan, the Confirmation Order will provide that all persons and entities who have held, hold, or may hold Claims against the Debtors are permanently enjoined, on and after the Confirmation Date, from (A) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or taking any act to recover such Claim outside of the claims allowance procedure discussed in the Plan and the Bankruptcy Code and Bankruptcy Rules, (B) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or Order against the Debtors on account

4848-8167-6242, v. 1

of any such Claim, (C) creating, perfecting or enforcing any encumbrance of any kind against the Debtors or against the property or interests in property of the Debtors on account of any such Claim and (D) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or against the property or interests in property of the Debtors on account of any such Claim.

**C.     Revesting of Property in the Debtors**

Except as provided in the Plan, the confirmation of the Plan revests all of the property of the estate in the Debtors.   Dr. William Focazio will receive 100% ownership of the Debtors upon confirmation.

**D.     Modification of Plan**

The Proponents may modify the Plan at any time before confirmation.  However, the Court may require a new disclosure statement and/or revoting on the Plan if Proponents modify the plan before confirmation.  ***You do not have to re-vote if you already voted.***

The Proponents may also seek to modify the Plan at any time after confirmation so long as (1) the Plan has not been substantially consummated, and (2) the Court authorizes the proposed modification after notice and a hearing. Proponents further reserves the right to modify the treatment of any Allowed Claims at any time after the Effective Date of the Plan upon the consent of the Creditor whose Allowed Claim treatment is being modified, so long as no other Creditors are materially adversely affected.

**E.     Post-Confirmation Conversion/Dismissal**

**<u>Focazio MD PA</u>**

The Post-Confirmation Officers/Managers of the Debtor, and their compensation, shall be as follows:

| Name | Position | Compensation |
|---|---|---|
| RJ Capital[40] | Manager | 60% of Net Profits |
| Dr. William Focazio | Physician/Owner/Operator | $100,000 |

### Endo Surgical

The Post-Confirmation Officers/Managers of the Debtor, and their compensation, shall be as follows:

| Name | Position | Compensation |
|---|---|---|
| RJ Capital[41] | Manager | 60% of Net Profits |
| Dr. William Focazio | Physician/Owner/Operator | $150,000 |

A creditor or party in interest may bring a motion to convert or dismiss the case under Section 1112(b), after the Plan is confirmed, if there is a default in performance of the Plan or if cause exists under Section 1112(b).  If the Court orders the case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estate, and the automatic stay will be reimposed upon the revested property only to the extent that relief from stay was not previously granted by the Court during this case.

---

[40] The Debtor intends to clarify its relationship, both monetary and non-monetary, with RJ Capital by filing a Certification of Dr. Focazio in support of confirmation which attaches the Management Agreement between the parties.   The Management Agreement will articulate (1) the funding to be provided by RJ Capital, (2) the compensation arrangement between the parties (the 60% arrangement is no longer applicable and will be clarified), and (3) the numerous duties that RJ Capital will be handling.   In short, RJ Capital will be handling **_all_** back-office duties including hiring, firing, scheduling, accounting, tax filings, procuring equipment, building management, etc.   The purpose of the Management Agreement is to, among other things, allow Dr. Focazio to solely concentrate on practicing medicine and generating revenues therefrom.   RJ Capital will be in charge of and be responsible for all non-medical duties and management as will be set forth in the Management Agreement.

[41] See footnote 40.

4848-8167-6242, v. 1

Quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) continue to be payable to the Office of the

United States Trustee post-confirmation until such time as the case is converted, dismissed, or closed

pursuant to a final decree.

**F.      Closing of Case**

Immediately followng the first payment under  Plans, such Plans shall be deemed

"consummated" and the Debtors will move to close the cases.  Nothing herein shall prevent the

Debtors from completing or instituting such proceedings as may be necessary for the enforcement

of any claim of the Debtors which may have existed against any third party before or which may

exist after Confirmation which may have not been enforced or prosecuted prior to Confirmation.

**McMANIMON, SCOTLAND
& BAUMANN, LLC**

*Counsel to William Focazio, MD, P.A. and
Endo Surgical Center of North Jersey, P.C.,
Chapter 11 Debtors and Debtors-in-Possession*

By:____/s/ Anthony Sodono, III_____
        ANTHONY SODONO, III
        SARI B. PLACONA

**WILLIAM FOCAZIO MD, PA and ENDO
SURGICAL CENTER OF NORTH JERSEY,
P.C.**

By:____*/s/ William Focazio*_____
        WILLIAM FOCAZIO

November 13, 2020

4848-8167-6242, v. 1